**In re Scott G. ELLINGSON and Cynthia J. Ellingson, Debtors.**

**FEDERAL LAND BANK OF OMAHA, Plaintiff,**

**v.**

**Scott G. ELLINGSON and Cynthia J. Ellingson, Defendants.**

**Bankruptcy No. 85–01638W.
Adv. No. 85–0368W.**

United States Bankruptcy Court,
N.D. Iowa.

June 20, 1986.

George Keith and Tim Hogan, Waterloo, Iowa, for plaintiff.

William A. Long, Eagle Grove, Iowa, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER re: § 727 COMPLAINT

MICHAEL J. MELLOY, Bankruptcy Judge.

The complaint of the Federal Land Bank of Omaha (Federal Land Bank) objecting to Debtors' discharge pursuant to 11 U.S.C. § 727 came on for trial before the court pursuant to notice to all parties. The court now issues its Findings of Fact, Conclusions of Law and Orders pursuant to F.R.

B.P. 7052. This is a core proceeding to 28 U.S.C. § 157(b)(2)(J).

## FINDINGS OF FACT

The Debtors, Scott and Cynthia Ellingson, are a young farm couple. In April, 1980, the Ellingsons purchased a 95–acre farm. Federal Land Bank of Omaha loaned $110,000.00 towards the $270,000.00 purchase price. This amount was evidenced by a variable interest rate note dated April 9, 1980. The note was secured by the real estate being purchased. The loan represented 46 percent of the purchase price. A Federal Land Bank appraisal indicated that the purchase price did represent the fair market value as of the date of purchase. Payments of approximately $7,000.00 were due January and July of each year. Those payments were timely made until the payment due January, 1985, was not made by the Ellingsons.

The balance of the purchase price was loaned by the Farmers Home Administration (FmHA). In addition to the loan for the purchase of the property with FmHA, the Ellingsons had other loans with FmHA. These loans included operating loans, as well as various emergency loans. These loans were secured by Debtors' livestock, crops and machinery. In regard to these loans, the Ellingsons were required to keep FmHA advised of their farming situation including preparation of annual financial statements. According to the testimony of Wayne Ziegler, FmHA representative, the Ellingsons were good farmers, and were above average in keeping FmHA advised of changes in their farm operation.

The years 1980–1984 were difficult ones for the Ellingsons. There were at least three years when they had below average crops, in one year due to drought and in two other years due to flooding. In addition, land values were beginning to plummet. By the date the Ellingsons filed their Chapter 7 petition on July 30, 1985, the 54 percent equity cushion of the Federal Land Bank had been completely eliminated.

In 1982, Clifford Nelson, a farmer in the area, approached Scott Ellingson with an

offer to lease 160 acres of land to the Ellingsons on a crop-share basis. Mr. Nelson was interested in helping a young person get started in farming and was willing to lease the property on a crop share basis, which was very advantageous to the tenant. Most land was being cash rented at that time at high prices. Scott Ellingson discussed the proposed lease with FmHA, which stated that it had no objection, and in fact, felt the lease would be helpful to the Ellingsons in starting their farming operation. Later in 1982, Mr. Nelson offered to lease the Ellingsons the remainder of his 320–acre farm when he retired in 1983, with an option to purchase. Again this was to be on a crop-share basis. FmHA advised Scott Ellingson that it would work with him on this lease arrangement.

In 1983 Mr. Nelson and the Ellingsons continued to talk about the lease and option to purchase. It was also agreed that a small acreage consisting of about five acres would be separated and would be sold to the Ellingsons. The separate acreage contained a house and would be used as the Ellingsons' homestead. These matters were, again, discussed with FmHA.

On May 5, 1983, the Nelsons and Ellingsons entered into an option for purchase of the farm land. The agreement also contained a 20–year crop-share lease of real property. The option provided that the price was to be determined at the time the option was exercised, with an appraisal clause if agreement as to purchase price could not be reached. The option was exclusive to the Ellingsons.

On May 16, 1983, the Ellingsons purchased by real estate contract the separate Nelson acreage. The five-acre tract had been appraised at $62,000.00. Mr. Nelson agreed to reduce the price to approximately $40,000.00 for these five acres. Another ten acres were added to the five-acre tract at $2,000.00 per acre. The total purchase price was $62,440.00 with a $1,000.00 down-payment. The first payment was due March 1, 1985, when yearly installments of $5,000.00 plus interest were to begin. Possession date was set for March 1, 1984.

After signing the lease agreement and the real estate contract, the Ellingsons attempted to sell their 95 acre farm. Initially, the Ellingsons tried to sell the farm without the services of a real estate broker. When those efforts proved unsuccessful, the Ellingsons entered into a listing agreement for the 95 acre farm with a realtor on April 10, 1984. The farm was listed for $250,000.00.

During 1984 the Ellingsons continued to suffer adversity in their farming operation. They again were troubled by diseased hogs, a problem which had been occurring for several years. Eventually the Ellingsons decided to get out of the livestock operation altogether. FmHA was kept advised of the Ellingsons' decision to discontinue the hog operation. FmHA advised it had no objection, provided the operating loans which were secured by the livestock were paid in full at the time the hogs were sold. The hogs eventually were sold and the FmHA was paid on all operating loans. FmHA released any lien it had against any of the Ellingsons' livestock, machinery and crops. This left as the only loan with FmHA the second mortgage against the 95 acre farm which secured the Federal Land Bank debt.

At the end of 1984 the Ellingsons discussed with FmHA their financial situation and the prospects for continued support by FmHA in their farming operation. FmHA advised Scott Ellingson to prepare a typical "farm and home plan" which would show one year's income and one year's expenses. This plan was prepared and reviewed by FmHA representatives. After conferences with FmHA officials, it was determined that the Ellingson operation would not cash flow and that FmHA would not loan him any additional money for operating expenses.

FmHA officials were also of the opinion that the equity in the 95 acre farm had deteriorated to the point where FmHA would realize little, if anything, over and above the Federal Land Bank mortgage. FmHA advised Scott Ellingson to urge his realtor to sell the farm for what it was

worth in hopes that it would clear the Federal Land Bank mortgage. On December 20, 1984, a new listing agreement for $142,500.00 was entered into with the realtor. FmHA also advised Scott Ellingson to contact Federal Land Bank regarding the possible voluntary conveyance of the 95 acres to Federal Land Bank.

Scott Ellingson did meet with Federal Land Bank officials. He prepared a financial statement and advised Federal Land Bank that he was thinking of deeding the farm back or selling the farm. Federal Land Bank told Scott Ellingson he could hold off making the January 1, 1985 payment until the farm was appraised and the parties came to some conclusion as to the course of action to be taken in connection with the property.

The Federal Land Bank appraised the property at $133,000.00. The Federal Land Bank mortgage was $107,417.00. In addition to the property which secured the Federal Land Bank debt, the Ellingsons also owned Federal Land Bank stock worth approximately $5,500.00 which also secured the mortgage indebtedness. Thus, the total security for the $107,417.00 debt, by Federal Land Bank appraisal, was $138,500.00.

The Federal Land Bank officers testified they would have accepted a deed back, provided Farmers Home released its mortgage. The record is unclear as to whether this fact was ever communicated to the Ellingsons. The realtor working with the Ellingsons contacted Federal Land Bank concerning a deed back. The realtor, who formerly had been an official of the Federal Land Bank, was advised that the Federal Land Bank was not interested in working with the Ellingsons as long as the Ellingsons intended to continue farming. Since the Ellingsons would continue to live on the acreage they were purchasing from Mr. Nelson, and would farm the 320 acres being rented from Mr. Nelson, the Federal Land Bank was not going to negotiate. If the Ellingsons were to leave farming the Federal Land Bank would be more interested in working out an agreement.

The Ellingsons were not able to come to an agreement with the Federal Land Bank for a deed back of the property. Eventually, the Federal Land Bank commenced foreclosure proceedings, and rented the property to a tenant for the 1985 crop year. The failure to come to an agreement as to a deed back clearly was the result of a breakdown in communications between Federal Land Bank, FmHA and the Ellingsons. There was never any clear understanding as to what Federal Land Bank required to accept a deed back and no understanding as to what FmHA required to release its mortgage.

In late 1984 or early 1985, when the Ellingsons realized they were in financial difficulty, they contacted attorney Larry Johnson of Iowa Falls, Iowa. They discussed with Mr. Johnson the options available to them, including the filing of a bankruptcy petition. Mr. Johnson testified he advised the Ellingsons they had a right to convert nonexempt property into exempt property. Mr. Johnson also advised the Ellingsons that any transfers outside the preference period, which Mr. Johnson believed was four months, would not be subject to attack by creditors.

In March, 1985, the Ellingsons sold most of their livestock inventory and remaining crops. After payment of the FmHA loan, the Ellingsons had cash of approximately $35,000.00 on hand. This cash, together with $20,400.00 of machinery, were unencumbered assets. On March 15, 1985, the $35,000.00 in cash was paid to Mr. Nelson, and the $20,400.00 of machinery was transferred to him. This payment was applied as follows:

| | |
|---|---|
| Expenses associated with lease | $3,500.87 |
| Interest on purchase of acreage | $7,693.44 |
| 1985 contract payment for principal on acreage | $5,000.00 |
| TOTAL: | $16,194.31 |

The balance of the payment in the sum of $39,205.69 represented an advance payment on the unpaid principal balance on the contract by which the Ellingsons were pur-

chasing the acreage which was being used as their homestead.

In making this payment Scott Ellingson was concerned with the fact that he was getting out of the livestock business and therefore would have no income until the completion of the harvest in the fall of 1985. Since he had no off-farm income, he was concerned with providing a home for his family and having money to live on until the harvest was completed.

On July 30, 1985, Scott and Cynthia Ellingson filed a Chapter 7 petition with the United States Bankruptcy Court. The voluntary petition was signed by the Ellingsons, as well as attorney Larry W. Johnson. The petitions were prepared by attorney Johnson, in consultation with Mr. and Mrs. Ellingson. The 15 acre homestead being purchased from Mr. Nelson was claimed as an exempt homestead by the Debtors.

The schedules contained a number of errors and omissions. Among them were the failure to list Mr. Nelson as a creditor in connection with the remaining unpaid balance owed on the contract for the purchase of the 15 acre homestead. Attorney Johnson was aware that Nelson was a secured creditor but testified that he failed to include the debt on the schedules by mistake.

A debt owed by Scott Ellingson to his father was also omitted from the list of indebtedness. Scott and Cynthia Ellingson specifically asked attorney Johnson whether that debt had to be listed on the schedules. Attorney Johnson questioned the Ellingsons about the debt and was told that the debt was originally $21,000.00 but that Scott Ellingson's father had already written off $11,000.00 of that amount. This left a $10,000.00 debt still owed to Scott Ellingson's father. Scott Ellingson advised attorney Johnson that his father was not putting any pressure on him to pay the debt, and that it was likely the remaining indebtedness would also be written off by Mr. Ellingson's father. Attorney Johnson advised the Ellingsons that such a debt was not a true debt which had to be listed on the schedules. Mr. Johnson felt that since

the father had already forgiven most of the debt, the listing of the remainder would only create family problems, and that it was his policy not to list those types of debt.

Schedule B-3 of Debtors' schedules listed the 20-year cropshare lease between Clifford Nelson as the lessor and the Debtors as lessee. However, that schedule did not make any reference to the Debtors' option rights contained within that lease agreement. Federal Land Bank alleges that the option was a valuable property right which was omitted from the Debtors' schedule of property. Attorney Johnson testified that the option was omitted because he felt it had no value. Since the option agreement was personal to the Ellingsons, and was for a price to be determined as fair market value as of the date the option was exercised, Attorney Johnson felt that it was of no value to the bankruptcy trustee. Accordingly, he felt it was not necessary to list the option agreement on the Debtors' schedules.

In the statement of affairs, question 11(a) asks: "What payments in whole or in part have been made during the year immediately preceeding the filing of the original petition herein on any of the following: (1) loans; (2) installment purchases of goods or services; (3) other debts?" In answering that question the Debtors' statement of affairs states a $35,000.00 payment was made to Clifford G. Nelson (landlord). The statement was in error, since the payment in fact had been cash of $35,000.00 and machinery of $20,400.00. In answer to question 12, which asked for information concerning other transfers of property, the statement of affairs states that no such transfers had been made in the year preceding the filing of the bankruptcy.

Attorney Johnson indicated that he was confused about the amount of the payment made to Mr. Nelson. It was his understanding that the $35,000.00 figure included the cash as well as machinery. He also felt that question 12 did not have to be answered because it referred to "other transfers". The $35,000.00 payment had

already been listed in response to question 11, and therefore he felt there was no need to answer the question a second time in response to question 12.

Scott Ellingson was extremely concerned about these apparent discrepancies in the bankruptcy schedules. In fact, Attorney Johnson testified that Mr. Ellingson called him frequently to inquire about the schedules and to make certain that they were correct. Mr. Johnson characterized Mr. Ellingson as a "worrier" who would call two or three times a week to make certain that everything had been done properly. Mr. Ellingson went so far as to prepare a list of written questions which he took to attorney Johnson to make certain the schedules were prepared properly. Among the written questions was an inquiry concerning the debt owed to Scott Ellingson's father, as well as the proper answer to question 11(a) about the payment to Mr. Nelson.

At the first meeting of creditors, Mr. Ellingson was listening to the debtors whose meeting preceded his, answer questions concerning their financial affairs. He again asked attorney Johnson on several occasions whether the schedules had been prepared properly and divulged all of the necessary information. Attorney Johnson again advised Mr. Ellingson that everything had been done properly and that he should not be so worried. In response to questions at the first meeting of creditors, it became clear that the information concerning the payment to Mr. Nelson was in error. As a consequence, attorney Johnson promptly called the Trustee following the first meeting of creditors to advise the Trustee about the error and to explain to the Trustee what events had in fact transpired. In addition, attorney Johnson prepared and filed amended schedules fully disclosing all of the transfers.

### DISCUSSION AND CONCLUSIONS OF LAW

#### I. False Oath

Federal Land Bank argues that the Debtors should be denied a discharge pursuant to § 727(a)(4)(A) which states as follows:

The court shall grant the debtor a discharge, unless ...

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; . . . .

In considering this matter the court starts with the well accepted principle that the bankruptcy code is intended to permit the honest debtor to get a new start in life free from debt and that § 727 must be construed strictly against the objectors and liberally in favor of the debtors. *In re Adlman,* 541 F.2d 999 (2d Cir.1976).

In order to sustain an objection to discharge based upon a false oath, the objecting creditor has the burden of showing that the debtor "knowingly and fraudulently" made a false oath. The phrase "knowingly and fradulently" means that there must be an intentional untruth in a matter material to the bankruptcy. *In re Melnick,* 360 F.2d 918 (2d Cir.1966).

While some of the omissions and mistakes made in these debtors' schedules, such as the failure to reveal the $20,400.00 transfer of machinery, were material omissions, Federal Land Bank has failed to sustain the burden of showing that the omissions were made knowingly and fraudulently. The debtors placed their trust and reliance for preparation of the schedules in their attorney. Unlike many debtors who take a cavalier and indifferent attitude toward their schedules, these debtors were extremely concerned and went to great lengths to make certain that the schedules were correctly and completely prepared. Unfortunately, through a combination of bad advice and poor communication, errors did arise in the schedules.

Generally, a debtor who acts in reliance on the advice of his attorney lacks the required intent to deny a discharge of his debts. *See In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986). Such reliance on the advice of the attorney must be reasonable. *In re Bateman,* 646 F.2d 1220, 1224 (8th Cir.1981).

The evidence in this case shows that not only did the debtors make frequent inquiries of their attorney concerning the accuracy of their schedules and statement of affairs, but the debtors' attorney telephoned the Trustee subsequent to the first meeting of creditors to advise him of the errors, and did amend the schedules accordingly. Based upon all of the facts, it is the conclusion of this Court that the reliance upon the debtors' attorney was reasonable in this situation and should not bar the debtors' discharge for false oath.

The objecting creditors argue that the case of *In re Collins*, 19 B.R. 874 (Bkrtcy. M.D.Fla.1982) stands for the proposition that any material error in the statement of affairs bars a debtor's discharge, even when the debtor relied upon the attorney's advice in the preparation of the statement of affairs. This Court believes that such a reading of the *Collins* case is overly broad. Rather, *Collins* holds that the reliance upon the attorney was not a good faith reliance under the facts of that case. In *Collins*, the trustee had to ferret out the existence of a transfer from official public records and confront the debtor with that information before the debtor would admit that the schedules were in error. Like the court in the *Collins* case, this Court is extremely concerned about the accuracy of debtors' schedules and statement of affairs. As stated in *Collins*, major improprieties should not and will not be permitted or condoned. There will certainly be cases where such improprieties will support a finding of nondischargeability under § 727. However, the Court believes that this case does not rise to that level, and that the Federal Land Bank has failed to meet the burden of showing that the errors were made knowingly and fraudulently by the debtors.

## II. Fraudulent Transfer

As an alternative ground, the Federal Land Bank asserts the debtors should be denied discharge for the conversion of nonexempt assets into exempt assets, approximately four months prior to the filing of bankruptcy. Federal Land Bank alleges that the debtors should be denied discharge under 11 U.S.C. § 727(a)(2) which provides that discharge will be denied if the debtor has transferred property "with intent to hinder, delay or defraud a creditor."

Preliminarily, it should be noted that the parties have treated the transfer of property as a conversion of all nonexempt property into exempt property. However, it would appear that since the debtors had transferred all or substantially all of their farm machinery, that in fact part of the transfer involved the transfer of property which would qualify as exempt property under one section of the Iowa Code into property which would qualify as exempt under the homestead exemption. Under § 627.6(10), the debtor may exempt up to $5,000.00 of farm machinery if the debtor is engaged in farming. If there are joint debtors, as in this case, up to $10,000.00 may be exempted if both the husband and wife are engaged in the farming operation. Therefore, it appears that up to $10,000.00 of the property which was transferred to Mr. Nelson would have been exempt prior to the transfer. However, since the parties chose to treat all of the property transferred as nonexempt property, the Court will assume for purposes of this ruling that all of the property transferred by the debtors was in fact nonexempt property prior to the transfer to Mr. Nelson and the conversion of the property into the exempt homestead.

The Court starts with the often cited proposition that exemptions should further one or more of the following social policies:

(1) To provide the debtor with property necessary for his physical survival;

(2) To protect the dignity and the cultural and religious identity of the debtor;

(3) To enable the debtor to rehabilitate himself financially and earn income in the future;

(4) To protect the debtor's family from the adverse consequences of impoverishment;

(5) To shift the burden of providing the debtor and his family with minimal financial support from society to the debtor's creditors.

Resnick, *Prudent Planning or Fraudulent Transfer? The Use of Nonexempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy,* 31 Rutgers Law Review 615, 621. *See also, In re Hahn,* 5 B.R. 242 (Bkrtcy. S.D.Iowa 1980).

Here, the debtors' acquisition and improvement of their homestead is consistent with several of these policies. The homestead certainly protects the family unit from impoverishment, relieves society from the burden from supplying subsidized housing, and provides to the debtors a means to survive during the period following their bankruptcy filing when they might have little or no outside income.

■ The courts have stated that the doing of that which is legal should not be penalized. Thus, the simple act of converting nonexempt property into exempt property on the eve of bankruptcy is not a fraud upon creditors. Such a conversion will not, in and of itself, deprive the debtor of his right to the exemptions or bar his discharge. An early Eighth Circuit opinion supporting this proposition is *Forsberg v. Security State Bank,* 15 F.2d 499 (8th Cir. 1926). In that case the debtor had sold a large part of his property, consisting of horses, cattle and hogs, and with the proceeds from that property purchased sheep and other personal property which was exempt under the applicable state law. In the *Forsberg* case the court cited the case of *First National Bank v. Glass,* 79 F. 706 (8th Cir.1897) wherein the court stated:

An insolvent debtor may use with impunity any of his property that is free from the liens and the vested equitable interests of his creditors to purchase a homestead for himself and his family in his own name. If he takes property that is not exempt from judicial sale and applies it to this purpose, he merely avails himself of a plain provision of the Constitution or the statute enacted for the ben-

efit of himself and his family. He takes nothing from his creditors by this action in which they have any vested right. The Constitution or statute exempting the homestead from the judgments of creditors is in force when they extend the credit to him, and they do so in the face of the fact that he has this right. Nor can the use of property that is not exempt from execution to procure a homestead be held to be a fraud upon the creditors of an insolvent debtor, because that which the law expressly sanctions and permits cannot be a legal fraud.

The court went on to state in *Forsberg* that the mere conversion of nonexempt assets into exempt assets is not a fraud upon creditors. The court stated that there must be facts constituting fraud apart and distinct from the mere transfer of nonexempt property into exempt. *In re Forsberg,* 15 F.2d at 502. This rule has been cited and followed in a number of other cases since that decision. *See, In re Reed,* 700 F.2d 986 (5th Cir.1983); *In re Adlman,* 541 F.2d 999 (2d Cir.1976); *Wudrick v. Clements,* 451 F.2d 988 (9th Cir.1971).

In enacting the 1978 Bankruptcy Code, Congress recognized debtors' rights to convert nonexempt property into exempt property prior to filing a bankruptcy petition. The legislative history is clear that Congress did not intend to change the existing law. Both the House and Senate reports state:

As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R.Rep. No. 595, 9th Cong., 1st Sess. 361 (1977), *reprinted in 1978* U.S. Code Cong. & Ad.News 5787, 5862. This expression of Congressional intent has been cited with approval in *In re Lindberg,* 735 F.2d 1087, 1090 (8th Cir.1984).

■ In order to deny discharge the court must find the property was transferred

with the actual intent to hinder, delay or defraud creditors. Constructive fraudulent intent, such as would suffice to set aside a transfer, cannot be the basis for the denial of discharge. *See In re Adlman,* 541 F.2d 999 (2d Cir.1976). In *In re Adeeb,* 787 F.2d 1339 (9th Cir.1986), the court stated:

> Section 727's denial of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge. *In re Devers,* 759 F.2d 751, 754 (9th Cir.1985). Accordingly, discharge of debts may be denied under section 727(a)(2)(A) only upon a finding of actual intent to hinder, delay, or defraud creditors. Constructive fraudulent intent cannot be the basis for denial of a discharge. *Id.* at 753. However, intent "may be established by circumstantial evidence, or by inferences drawn from a course of conduct." *Id.* at 753–54.

In looking to the issue of actual fraud, the courts have found there was actual fraud when the funds invested in the exempt property were obtained from the sale of goods. *Kangas v. Robie,* 264 F. 92 (8th Cir.1920). Rapid conversion of nonexempt assets to extinguish one and reduce another home mortgage, after arranging with creditors to be free of payment obligations until the following year, together with a diversion of daily business receipts into an account unknown to the creditors is another example of the type of conduct which implies actual fraudulent intent. *In re Reed,* 700 F.2d 986 (5th Cir.1983). The *Reed* court pointed out that the evidence amply supported a finding of a course of conduct evidencing actual intent to defraud. *In re Reed,* 700 F.2d at 991. The court in that case was careful to point out that "while pre-bankruptcy conversion of nonexempt assets is frequently motivated by the attempt to put those assets beyond the reach of creditors, which is the function of an exemption, evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge." 700 F.2d at 991.

■ Applying the case law to the facts at hand, this Court must conclude that the Federal Land Bank has failed to meet its burden to show actual fraud by the debtors in the conversion of nonexempt into exempt assets. The evidence shows that the debtors merely took nonexempt cash and farm machinery and converted that property into their homestead. This is conduct which the courts have clearly sanctioned in the past. In fact, courts have sanctioned the creation of a homestead or the enhancement of a homestead on the eve of bankruptcy. *See, In re Irvin,* 120 F. 733 (8th Cir.1903), a case where the court found that the purchase of a homestead a mere six days prior to the filing of bankruptcy was not a fraud on creditors and was a legitimate conversion of nonexempt into exempt assets.

In this case, the debtors not only did that which is legal, but also enhanced their equity in an asset which clearly comports with the social policy behind the exemption statute.

■ The Federal Land Bank seems to be taking the position that the debtors had a duty to pay their creditors with the nonexempt assets, and not use those assets to purchase exempt property. However, even if the Court were to find that the debtors knew at the time the assets were converted from nonexempt to exempt assets that they were about to go into bankruptcy, this fact alone would not render the conversion of assets a fraudulent transfer. In *Forsberg v. Security State Bank,* the Court found that the debtor had determined that he would have to go through bankruptcy before the conversion of nonexempt into exempt assets was made. 15 F.2d at 502. *See also,* Resnick, *supra.*

■ The burden of proof is upon the objecting creditor to show. actual fraud. Though it is clear the debtors converted nonexempt assets into exempt assets within a few months of bankruptcy, there is no proof that the conversion was done with a fraudulent intent. The mere fact of the conversion alone does not prove fraudulent intent. Accordingly, the Court finds that the complaint of Federal Land Bank object-

**280**

ing to debtors' discharge pursuant to 11 U.S.C. § 727(a)(2) is denied.

### ORDER

For all of the reasons stated, it is herewith ordered that the complaint of the Federal Land Bank of Omaha objecting to debtors' discharge is denied and the complaint is herewith dismissed.