848 F.2d 871
 19 Collier Bankr.Cas.2d 287, 17 Bankr.Ct.Dec. 1205,
Bankr. L. Rep. P 72,316
 NORWEST BANK NEBRASKA, N.A., Business Development
Corporation of Nebraska and Harold J. Panuska, as Trustee
for the Harold J. Panuska Profit Sharing Trust and the
Harold J. Panuska Employee Trust Fund, Appellees,
v.
Omar A. TVETEN, Appellant.
 No. 87-5312.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 14, 1988.
Decided June 2, 1988.
Rehearing and Rehearing En Banc Denied Aug. 9, 1988.
 
 Cass S. Weil, St. Paul, Minn., for appellant.
 Gordon B. Conn, Jr., Minneapolis, Minn., for appellees.
 Before ARNOLD, WOLLMAN and TIMBERS,* Circuit Judges.
 TIMBERS, Circuit Judge.
 
 
 1
 Appellant Omar A. Tveten, a physician who owed creditors almost $19,000,000, mostly in the form of personal guaranties on a number of investments whose value had deteriorated greatly, petitioned for Chapter 11 bankruptcy. He had converted almost all of his non-exempt property, with a value of about $700,000, into exempt property that could not be reached by his creditors. The bankruptcy court, on the basis of its findings of fact and conclusions of law, entered an order on February 27, 1987, denying a discharge in view of its finding that Tveten intended to defraud, delay, and hinder his creditors. The district court, in an order entered July 10, 1987 in the District of Minnesota, Diana E. Murphy, District Judge, affirmed the bankruptcy court's order. On appeal, Tveten asserts that his transfers merely constituted astute pre-bankruptcy planning. We hold that the bankruptcy court was not clearly erroneous in inferring fraudulent intent on the part of Tveten. We affirm.
 
 I.
 
 2
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 3
 Tveten is a 59 year old physician in general practice. He is the sole shareholder of Omar A. Tveten, P.A., a professional corporation. He has no dependents. He began investing in various real estate developments. These investments initially were quite successful. Various physician friends of Tveten joined him in organizing a corporation to invest in these ventures. These investments were highly leveraged. The physicians, including Tveten, personally had guaranteed the debt arising out of these investments. In mid-1985, Tveten's investments began to sour. He became personally liable for an amount close to $19,000,000--well beyond his ability to pay. Appellees Norwest Bank Nebraska, N.A. ("Norwest Bank"), Business Development Corporation of Nebraska ("Business Development"), and Harold J. Panuska ("Panuska") as trustee of the Harold J. Panuska Profit Sharing Trust and the Harold J. Panuska Employee Trust Fund, became creditors of Tveten as a result of his various investment ventures.
 
 
 4
 Tveten filed a Chapter 11 petition on January 7, 1986. Meanwhile, several creditors already had commenced lawsuits against him. Panuska had obtained a $139,657 judgment against him on October 9, 1985. Norwest Bank and Business Development had commenced an action against him but had not obtained judgment when Tveten filed for bankruptcy. On the date the Chapter 11 petition was filed, Tveten owed his creditors close to $19,000,000.
 
 
 5
 Before filing for bankruptcy, Tveten consulted counsel. As part of his pre-bankruptcy planning, he liquidated almost all of his non-exempt property, converting it into exempt property worth approximately $700,000. This was accomplished through some seventeen separate transfers. The non-exempt property he liquidated included land sold to his parents and his brother, respectively, for $70,000 and $75,732 in cash; life insurance policies and annuities with a for-profit company with cash values totalling $96,307.58; his net salary and bonuses of $27,820.91; his KEOGH plan and individual retirement fund of $20,487.35; his corporation's profit-sharing plan worth $325,774.51; and a home sold for $50,000.[1] All of the liquidated property was converted into life insurance or annuity contracts with the Lutheran Brotherhood, a fraternal benefit association, which, under Minnesota law, cannot be attached by creditors. Tveten concedes that the purpose of these transfers was to shield his assets from creditors. Minnesota law provides that creditors cannot attach any money or other benefits payable by a fraternal benefit association. Minn.Stat. Secs. 550.37, 64B.18 (1986). Unlike most exemption provisions in other states, the Minnesota exemption has no monetary limit. Indeed, under this exemption, Tveten attempted to place $700,000 worth of his property out of his creditors' reach.
 
 
 6
 Tveten sought a discharge with respect to $18,920,000 of his debts. Appellees objected to Tveten's discharge. In its order of February 27, 1987, the bankruptcy court concluded that, although Tveten's conversion of non-exempt property to exempt property just before petitioning for bankruptcy, standing alone, would not justify denial of a discharge, his inferred intent to defraud would.[2] The bankruptcy court held that, even if the exemptions were permissible, Tveten had abused the protections permitted a debtor under the Bankruptcy Code (the "Code"). His awareness of Panuska's judgment against him and of several pending lawsuits, his rapidly deteriorating business investments, and his exposure to extensive liability well beyond his ability to pay, all were cited by the court in its description of the circumstances under which Tveten converted his property. Moreover, the court concluded that Tveten intended to hinder and delay his creditors. Accordingly, the bankruptcy court denied Tveten a discharge.
 
 
 7
 Tveten appealed from the bankruptcy court order to the federal district court. In a memorandum opinion and order entered July 10, 1987, the district court affirmed the denial of a discharge, concluding that the bankruptcy court's finding as to Tveten's intent was not clearly erroneous.[3]
 
 
 8
 The instant appeal followed. Basically, Tveten asserts on appeal that as a matter of law we should reject the factors relied on by the bankruptcy court to infer that Tveten intended to delay, hinder and defraud creditors. We disagree. We affirm.
 
 II.
 
 9
 The sole issue on appeal is whether Tveten properly was denied a discharge in view of the transfers alleged to have been in fraud of creditors.
 
 
 10
 At the outset, it is necessary to distinguish between (1) a debtor's right to exempt certain property from the claims of his creditors and (2) his right to a discharge of his debts. The Code permits a debtor to exempt property either pursuant to the provisions of the Code if not forbidden by state law, 11 U.S.C. Sec. 522(b) & (d) (1982 & Supp. IV 1986), or pursuant to the provisions of state law and federal law other than the minimum allowances in the Code. 11 U.S.C. Sec. 522(b)(2). When the debtor claims a state-created exemption, the scope of the claim is determined by state law. It is well established that under the Code the conversion of non-exempt to exempt property for the purpose of placing the property out of the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled. E.g., Ford v. Poston, 773 F.2d 52, 54 (4th Cir.1985); In re Lindberg, 735 F.2d 1087, 1090 (8th Cir.), cert. denied sub nom. Armstrong v. Lindberg, 469 U.S. 1073 (1984); In re Reed, 700 F.2d 986, 990 (5th Cir.1983); 3 Collier on Bankruptcy p 522.08, at 36-37 (15th ed. 1984). Both the House and Senate Reports regarding the debtor's right to claim exemptions state:
 
 
 11
 "As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law."
 
 
 12
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6317; S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5862. The rationale behind this policy is that "[t]he result which would obtain if debtors were not allowed to convert property into allowable exempt property would be extremely harsh, especially in those jurisdictions where the exemption allowance is minimal." 3 Collier on Bankruptcy, supra, p 522.08, at 40. This blanket approval of conversion is qualified, however, by denial of discharge if there was extrinsic evidence of the debtor's intent to defraud creditors. E.g., Ford, supra, 773 F.2d at 55; In re Reed, supra, 700 F.2d at 990.[4]
 
 
 13
 A debtor's right to a discharge, however, unlike his right to an exemption, is determined by federal, not state, law. Reed, 700 F.2d at 991. The Code provides that a debtor may be denied a discharge under Chapter 7 if, among other things, he has transferred property "with intent to hinder, delay, or defraud a creditor" within one year before the date of the filing of the petition. 11 U.S.C. Sec. 727(a)(2) (1982 & Supp. IV 1986). Although Tveten filed for bankruptcy under Chapter 11, the proscription against discharging a debtor with fraudulent intent in a Chapter 7 proceeding is equally applicable against a debtor applying for a Chapter 11 discharge. The reason for this is that the Code provides that confirmation of a plan does not discharge a Chapter 11 debtor if "the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." 11 U.S.C. Sec. 1141(d)(3)(C) (1982).
 
 
 14
 Although the determination as to whether a discharge should be granted or denied is governed by federal law, the standard applied consistently by the courts is the same as that used to determine whether an exemption is permissible, i.e. absent extrinsic evidence of fraud, mere conversion of non-exempt property to exempt property is not fraudulent as to creditors even if the motivation behind the conversion is to place those assets beyond the reach of creditors. Ford, supra, 773 F.2d at 55; In re Reed, supra, 700 F.2d at 990; Forsberg v. Security State Bank, 15 F.2d 499 (8th Cir.1926).
 
 
 15
 As the bankruptcy court correctly found here, therefore, the issue in the instant case revolves around whether there was extrinsic evidence to demonstrate that Tveten transferred his property on the eve of bankruptcy with intent to defraud his creditors. The bankruptcy court's finding that there was such intent to defraud may be reversed by us only if clearly erroneous. McCormick v. Security State Bank, 822 F.2d 806, 808 (8th Cir.1987); In re Reed, supra, 700 F.2d at 990; In re Cadarette, 601 F.2d 648, 650 (2d Cir.1979).
 
 
 16
 There are a number of cases in which the debtor converted non-exempt property to exempt property on the eve of bankruptcy and was granted a discharge because there was no extrinsic evidence of the debtor's intent to defraud. In Forsberg, supra, an old decision of our Court, a debtor was granted a discharge despite his trade of non-exempt cattle for exempt hogs while insolvent and in contemplation of bankruptcy. Although we found that the trade was effected so that the debtor could increase his exemptions, the debtor "should [not] be penalized for merely doing what the law allows him to do." 15 F.2d at 501. We concluded that "before the existence of such fraudulent purpose can be properly found, there must appear in evidence some facts or circumstances which are extrinsic to the mere facts of conversion of nonexempt assets into exempt and which are indicative of such fraudulent purpose." Id. at 502. Accord, In re Adlman, 541 F.2d 999 (2d Cir.1976); In re Ellingson, 63 B.R. 271 (N.D.Iowa 1986).
 
 
 17
 There also are a number of cases, however, in which the courts have denied discharges after concluding that there was extrinsic evidence of the debtor's fraudulent intent. In Ford, supra, the debtor had executed a deed of correction transferring a tract of land to himself and his wife as tenants by the entirety. The debtor had testified that his parents originally had conveyed the land to the debtor alone, and that this was a mistake that he corrected by executing a deed of correction. Under relevant state law, the debtor's action removed the property from the reach of his creditors who were not also creditors of his wife. The Fourth Circuit, in upholding the denial of a discharge, found significant the fact that this "mistake" in the original transfer of the property was "corrected" the day after an unsecured creditor obtained judgment against the debtor. 773 F.2d at 55. The Fourth Circuit held that the bankruptcy court, in denying a discharge, was not clearly erroneous in finding the requisite intent to defraud, after "[h]aving heard ... [the debtor's] testimony at trial and having considered the circumstances surrounding the transfer". Id. In In re Reed, supra, shortly after the debtor had arranged with his creditors to be free from the payment obligations until the following year, he rapidly had converted non-exempt assets to extinguish one home mortgage and to reduce another four months before bankruptcy, and had diverted receipts from his business into an account not divulged to his creditors. The Fifth Circuit concluded that the debtor's "whole pattern of conduct evinces that intent." 700 F.2d at 991. The court went further and stated:
 
 
 18
 "It would constitute a perversion of the purposes of the Bankruptcy Code to permit a debtor earning $180,000 a year to convert every one of his major nonexempt assets into sheltered property on the eve of bankruptcy with actual intent to defraud his creditors and then emerge washed clean of future obligation by carefully concocted immersion in bankruptcy waters."
 
 
 19
 Id. at 992.
 
 
 20
 In most, if not all, cases determining whether discharge was properly granted or denied to a debtor who practiced "pre-bankruptcy planning", the point of reference has been the state exemptions if the debtor was claiming under them. Although discharge was not denied if the debtor merely converted his non-exempt property into exempt property as permitted under state law, the exemptions involved in these cases comported with federal policy to give the debtor a "fresh start"--by limiting the monetary value of the exemptions. This policy has been explicit, or at least implicit, in these cases. In Forsberg, supra, for example, we stated that it is not fraudulent for an individual who knows he is insolvent to convert non-exempt property into exempt property, thereby placing the property out of the reach of creditors
 
 
 21
 "because the statutes granting exemptions have made no such exceptions, and because the policy of such statutes is to favor the debtors, at the expense of the creditors, in the limited amounts allowed to them, by preventing the forced loss of the home and of the necessities of subsistence, and because such statutes are construed liberally in favor of the exemption."
 
 
 22
 Forsberg, supra, 15 F.2d at 501 (emphasis added). Similarly, in In re Ellingson, supra, 63 B.R. 271, in holding that the debtors' conversion of non-exempt cash and farm machinery did not provide grounds for denial of a discharge, the court relied on the social policies behind the exemptions. The court found that the debtors' improvement of their homestead was consistent with several of these policies, such as protecting the family unit from impoverishment, relieving society from the burden of supplying subsidized housing, and providing the debtors with a means to survive during the period following their bankruptcy filing when they might have little or no income. The court held that exemptions should further one or more of the following social policies:
 
 
 23
 " '(1) To provide the debtor with property necessary for his physical survival; (2) To protect the dignity and the cultural and religious identity of the debtor; (3) To enable the debtor to rehabilitate himself financially and earn income in the future; (4) To protect the debtor's family from the adverse consequences of impoverishment; (5) To shift the burden of providing the debtor and his family with minimal financial support from society to the debtor's creditors.' "
 
 
 24
 Id. at 277-78 (quoting Resnick, Prudent Planning or Fraudulent Transfer?, 31 Rutgers L.R. 615, 621); see also In re Adlman, supra, 541 F.2d at 1003; In re Zouhar, 10 B.R. 154, 156 (Bankr.D.N.Mex.1981).
 
 
 25
 In the instant case, however, the state exemption relied on by Tveten was unlimited, with the potential for unlimited abuse. Indeed, this case presents a situation in which the debtor liquidated almost his entire net worth of $700,000 and converted it to non-exempt property in seventeen transfers on the eve of bankruptcy while his creditors, to whom he owed close to $19,000,000, would be left to divide the little that remained in his estate. Borrowing the phrase used by another court, Tveten "did not want a mere fresh start, he wanted a head start." In re Zouhar, supra, 10 B.R. at 156 (emphasis in original). His attempt to shield property worth approximately $700,000 goes well beyond the purpose for which exemptions are permitted. Tveten's reliance on his attorney's advice does not protect him here, since that protection applies only to the extent that the reliance was reasonable. In re Bateman, 646 F.2d 1220, 1224 (8th Cir.1981).
 
 
 26
 The bankruptcy court, as affirmed by the district court, examined Tveten's entire pattern of conduct and found that he had demonstrated fraudulent intent. We agree. While state law governs the legitimacy of Tveten's exemptions, it is federal law that governs his discharge. Permitting Tveten, who earns over $60,000 annually, to convert all of his major non-exempt assets into sheltered property on the eve of bankruptcy with actual intent to defraud his creditors "would constitute a perversion of the purposes of the Bankruptcy Code". In re Reed, supra, 700 F.2d at 992. Tveten still is entitled to retain, free from creditors' claims, property rightfully exempt under relevant state law.[5]
 
 
 27
 We distinguish our decision in Hanson v. First National Bank, 848 F.2d 866 (8th Cir.1988), decided today. Hanson involves a creditor's objection to two of the debtors' claimed exemptions under South Dakota law, a matter governed by state law. The complaint centered on the Hansons' sale, while insolvent, of non-exempt property to family members for fair market value and their use of the proceeds to prepay their preexisting mortgage and to purchase life insurance policies in the limited amounts permissible under relevant state law. The bankruptcy court found no extrinsic evidence of fraud. The district court, in a memorandum opinion and order entered June 15, 1987, affirmed. We also affirmed, concluding that the case fell within the myriad of cases which have permitted such a conversion on the eve of bankruptcy.
 
 III.
 To summarize:
 
 28
 We hold that the bankruptcy court was not clearly erroneous in inferring fraudulent intent on the part of the debtor, rather than astute pre-bankruptcy planning, with respect to his transfers on the eve of bankruptcy which were intended to defraud, delay and hinder his creditors.
 
 
 29
 Affirmed.
 
 
 30
 ARNOLD, Circuit Judge, dissenting.
 
 
 31
 The Court reaches a result that appeals to one's general sense of righteousness. I believe, however, that it is contrary to clearly established law, and I therefore respectfully dissent.
 
 
 32
 Dr. Tveten has never made any bones about what he is doing, or trying to do, in this case. He deliberately set out to convert as much property as possible into a form exempt from attachment by creditors under Minnesota law. Such a design necessarily involves an attempt to delay or hinder creditors, in the ordinary, non-legal sense of those words, but, under long-standing principles embodied both in judicial decisions and in statute, such a purpose is not unlawful. The governing authority in this Court is Forsberg v. Security State Bank, 15 F.2d 499 (8th Cir.1926). There we said:
 
 
 33
 It is well settled that it is not a fraudulent act by an individual who knows he is insolvent to convert a part of his property which is not exempt into property which is exempt, for the purpose of claiming his exemptions therein, and of thereby placing it out of the reach of his creditors.
 
 
 34
 Id. at 501. Thus, under the controlling law of this Circuit, someone who is insolvent may convert property into exempt form for the very purpose of placing that property beyond the reach of his creditors.
 
 
 35
 A debtor's right to make full use of statutory exemptions is fundamental to bankruptcy law. To unsecured creditors, a debtor's conversion of his assets into exempt categories of property will always appear unfair, but this apparent unfairness is simply a consequence of the existence of exemptions under the jurisdiction's bankruptcy law. In an early case in this Circuit, Judge Walter H. Sanborn, one of the patriarchs of this Court, explained:
 
 
 36
 An insolvent debtor may use with impunity any of his property that is free from the liens and equitable interests of his creditors to purchase a homestead.... If he takes property that is not exempt from judicial sale and applies it to this purpose, he merely avails himself of a plain provision of the constitution or the statute enacted for [his] benefit.... He takes nothing from the creditors by this action in which they have any vested right. The constitution or statute exempting the homestead from the judgments of creditors is in force when they extend the credit to him, and they do so in the face of the fact that he has this right. Nor can the use of property that is not exempt from execution to procure a homestead be held to be a fraud upon the creditors ..., because that which the law expressly sanctions and permits cannot be a legal fraud.
 
 
 37
 First National Bank of Humboldt v. Glass, 79 F. 706, 707 (8th Cir.1897) (emphasis added)
 
 
 38
 The same principle was confirmed by Congress when it enacted the Bankruptcy Code of 1978. The report of the House Judiciary Committee states as follows:
 
 
 39
 As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. See Hearings, Pt. III, at 1355-58. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.
 
 
 40
 H.R.Rep. No. 595, 95th Cong., 2d Sess. 361, reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6317. The same language appears in S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5862. In the hearings referred to in the House Committee report, two federal judges, concerned about the "outrageous" implications of existing law, specifically urged Congress to incorporate provisions in the new Bankruptcy Code which would make pre-bankruptcy conversion of assets fraudulent as a matter of federal law. See Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 1st & 2nd Sess., ser. 27, pt. 3, pp. 1355-58 (1975-76). The fact that Congress declined to change existing law, when presented with the same objections to the propriety of debtor tactics like Tveten's that the Court now expresses, indicates that Congress did not intend Sec. 727(a)(2) to proscribe such conduct. The House Report's language plainly says that debtors may convert nonexempt property into exempt property, that doing so is not fraudulent, and that debtors may make "full use" of any applicable exemption. Recent cases in our Court have reiterated this principle. E.g., In re Lindberg, 735 F.2d 1087, 1090 (8th Cir.), cert. denied sub nom. Armstrong v. Lindberg, 469 U.S. 1073, 105 S.Ct. 566, 83 L.Ed.2d 507 (1984).
 
 
 41
 To be sure, if there is extrinsic evidence of fraud, or of a purpose to hinder or delay creditors, discharge may and should be denied, but "extrinsic," in this context, must mean something beyond the mere conversion of assets into exempt form for the purpose of putting them out of the reach of one's creditors. If Tveten had lied to his creditors, like the debtor in McCormick v. Security State Bank, 822 F.2d 806 (8th Cir.1987), or misled them in some way, like the debtor in In re Reed, 700 F.2d 986 (5th Cir.1983), or transferred property for less than fair value to a third party, like the debtor in Ford v. Poston, 773 F.2d 52 (4th Cir.1985), we would have a very different case. There is absolutely no evidence of that sort of misconduct in this record, and the Court's opinion filed today cites none.
 
 
 42
 One is tempted to speculate what the result would have been in this case if the amount of assets converted had been $7,000, instead of $700,000. Indeed, the large amount of money involved is the only difference I can see between this case and Forsberg. It is true that the Forsberg opinion referred to "the limited amounts allowed to" debtors by exemptions, 15 F.2d at 501, but whether exemptions are limited in amount is a legislative question ordinarily to be decided by the people's elected representatives, in this case the Minnesota Legislature.[1] Where courts punish debtors simply for claiming exemptions within statutory limits, troubling problems arise in separating judicial from legislative power. As Judge Kishel explained in his excellent opinion in In re Johnson, 80 B.R. 953 (Bankr.D.Minn.1987)[2]:
 
 
 43
 The legislative branch alone determines what is necessary ... to meet a debtor's needs, by establishing the nature and value of the property subject to claims exemption.... To deny discharge for a debtor's non-fraudulent invocation of these protections is, overtly or covertly, to make a political and/or value judgment on these legislative determinations. To equate a non-fraudulent intent to 'place assets beyond the reach of creditors' with an invidious intent to 'hinder or delay creditors' is ultimately to frustrate statutory exemption rights by causing a chilling effect on the full exercise of those rights. A court which causes such a chilling effect is, in a very real sense, invading legislative prerogatives by substituting its own judgment for that of the legislature.
 
 
 44
 At 963 (footnote omitted).
 
 
 45
 If there ought to be a dollar limit, and I am inclined to think that there should be, and if practices such as those engaged in by the debtor here can become abusive, and I admit that they can, the problem is simply not one susceptible of a judicial solution according to manageable objective standards. A good statement of the kind of judicial reasoning that must underlie the result the Court reaches today appears in In re Zouhar, 10 B.R. 154 (Bankr.D.N.M.1981), where the amount of assets converted was $130,000. The Bankruptcy Court denied discharge, stating, among other things, that " 'there is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered.' " Id. at 157. If I were a member of the Minnesota Legislature, I might well vote in favor of a bill to place an over-all dollar maximum on any exemption.[3] But sitting as a judge, by what criteria do I determine when this pig becomes a hog? If $700,000 is too much, what about $70,000? Would it matter if the debtor were a farmer, as in Forsberg, rather than a physician? (I ask the question because the appellee creditor's brief mentions the debtor's profession, which ought to be legally irrelevant, several times.)
 
 
 46
 Debtors deserve more definite answers to these questions than the Court's opinion provides. In effect, the Court today leaves the distinction between permissible and impermissible claims of exemption to each bankruptcy judge's own sense of proportion. As a result, debtors will be unable to know in advance how far the federal courts will allow them to exercise their rights under state law.
 
 
 47
 Where state law creates an unlimited exemption, the result may be that wealthy debtors like Tveten enjoy a windfall that appears unconscionable, and contrary to the policy of the bankruptcy law. I fully agree with Judge Kishel, however, that
 
 
 48
 [this] result ... cannot be laid at [the] Debtor's feet; it must be laid at the feet of the state legislature. Debtor did nothing more than exercise a prerogative that was fully his under law. It cannot be said that his actions have so tainted him or his bankruptcy petition as to merit denial of discharge.
 
 
 49
 Johnson, supra, at 963 (footnote omitted). I submit that Tveten did nothing more fraudulent than seek to take advantage of a state law of which the federal courts disapprove.
 
 
 50
 I would reverse this judgment and hold that the debtor's actions in converting property into exempt form do not bar a discharge in bankruptcy.
 
 
 
 *
 Of the Second Circuit, by designation
 
 
 [1]
 There were no claims that these transfers were for less than market value
 
 
 [2]
 Several creditors also objected to Tveten's claimed exemptions. In response, the bankruptcy court, by order entered September 16, 1986, certified the question to the Minnesota Supreme Court. The bankruptcy court decided that it need not wait for the Supreme Court's decision, since the determinative factor on the issue of discharge was Tveten's intent
 
 
 [3]
 Before the district court entered its order, the Supreme Court of Minnesota held in a decision entered March 27, 1987, that annuities and life insurance contracts issued by a fraternal benefit society were exempt under Minnesota law, but that these statutory provisions violated the Minnesota Constitution. In re Tveten, 402 N.W.2d 551 (Minn.1987). Accordingly, Tveten no longer will be able to claim these exemptions. Following the opinion of the Supreme Court of Minnesota, Tveten claimed an exemption for his pension in the amount of approximately $200,000. He and his creditors settled this issue before the bankruptcy court. He will retain this property as exempt
 
 
 [4]
 This exception comports with congressional intent. Both the House and Senate Reports use the phrase "[a]s under current law". Under existing law prior to the passage of the 1978 Act, courts also had applied this exception. Ford, supra, 773 F.2d at 55; In re Reed, supra, 700 F.2d at 990
 
 
 [5]
 Supra note 3
 
 
 [1]
 In First Nat'l Bank of Humboldt, supra, the debtor's homestead was originally in Nebraska, which by statute limited the homestead exemption to land worth $2,000. The debtor sold his homestead for $6,000 and used the money to buy a new home in Kansas, where the homestead exemption was unlimited in dollar amount. The debtor had this new Kansas homestead conveyed to his wife. See 79 F. at 706-07. This tactic succeeded, and the creditor's attempt to reach the Kansas land was rebuffed by this Court
 
 
 [2]
 Counsel in this case have advised us that an appeal in Johnson is now pending in the District Court
 
 
 [3]
 There is some irony in the fact that the exemption sought by the debtor in this case, that for benefits under annuities or life-insurance policies issued by fraternal associations, has been held unconstitutional under two provisions of the Minnesota Constitution. One such provision, Article 1, Section 12, provides that "[a] reasonable amount of property shall be exempt...." The Supreme Court of Minnesota has held that the exemption statute involved in the present case is unconstitutional precisely because it contains no dollar limit. In re Tveten, 402 N.W.2d 551, 556-58 (Minn.1987). So the principle of limitation has been upheld, the debtor has in any event lost the exemption he sought, but he also loses his discharge under today's decision