In re Raymond Louis ZOUHAR,
Bankrupt.

ALBUQUERQUE NATIONAL BANK, a
National Banking Association,
Plaintiff,

v.

Raymond Louis ZOUHAR, Defendant.

Hilda ZOUHAR, Plaintiff,

v.

Raymond Louis ZOUHAR, Defendant.

Willard F. KITTS, Plaintiff,

v.

Raymond Louis ZOUHAR, Defendant.

Bankruptcy No. 78–428J.

United States Bankruptcy Court,
D. New Mexico.

March 24, 1981.

Jennie Deden Behles, Albuquerque, N. M., for bankrupt-defendant.

Paul M. Fish, Albuquerque, N. M., for plaintiff, Albuquerque National Bank.

Elizabeth Whitefield, Albuquerque, N. M., for plaintiffs Hilda Zouhar and Willard F. Kitts.

FINDINGS OF FACT, CONCLUSIONS
OF LAW AND JUDGMENT

ROBERT A. JOHNSON, Bankruptcy Judge.

This case came on for trial on April 12, 1979, upon the objection to discharge filed by the Albuquerque National Bank under § 14(c)(4) of the Act, and the complaint to determine the dischargeability of certain debts arising under a divorce decree. Albuquerque National Bank (Bank) was present by its attorney, Paul Fish; Hilda Zouhar and Willard F. Kitts were present by their attorney, Elizabeth Whitefield; and Raymond Zouhar was present by Jennie Behles.

The basic issue in this case is whether the actions of the defendant bankrupt Raymond Zouhar in transmuting his non–exempt property to exempt property on the eve of bankruptcy was availing himself of his statutory right to exemptions or was transferring his property with the intent to hinder, delay or defraud his creditors, violating § 14(c)(4), which provides,

c. The court shall grant the discharge unless satisfied that the bankrupt has

. . .

(4) at any time subsequent to the first day of the twelve months immedi-

ately preceding the filing of the petition in bankruptcy, transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property, with intent to hinder, delay, or defraud his creditors; . . .

The background of the case is as follows:

Hilda Zouhar sued Raymond Zouhar for divorce in September of 1977. It may safely be said that the divorce was unfriendly, if not downright bitter. Settlement negotiations between the parties commenced immediately, and ultimately resulted in an agreement being reached on a settlement on January 23, 1978. During the progress of these negotiations, defendant Raymond Zouhar, a medical doctor, decided that he would purchase a home in which to live. At least a portion of the decision was based upon his notion that buying a home was a good investment, and thus preferable to renting.

On February 3, 1978, the divorce decree was entered in the state court. Approximately one week later, Raymond Zouhar went into the office of his divorce attorney to pick up a copy of the divorce decree. At that time he asked his divorce attorney about bankruptcy and was referred to his present bankruptcy counsel. Zouhar testified that his inquiry was "half joking" and that the inquiry was "just in case; things were getting tight." Although Zouhar initially denied that he had considered bankruptcy before the divorce, after his memory was refreshed by a deposition, he recalled thinking "in passing" about bankruptcy before the divorce. At any rate, by February 10, 1978, he had considered bankruptcy as "a contingency plan."

The financial situation at this juncture for Mr. Zouhar was approximately as follows. As an anesthesiologist, Zouhar had annual earnings of approximately $70,000. He had between $80,000 and $85,000 in a profit sharing trust, wholly exempt under state law. He owned stock in his professional corporation, fairly valued at approximately $44,000, which was not exempt under state law. He had approximately $40,-000 worth of debts, $36,000 of which was traceable directly to the divorce. Of that latter sum, $15,000 represented an obligation to Albuquerque National Bank to pay on a house mortgage. The sum of $2,000 was owed to Mr. Kitts, his ex-wife's attorney, ordered to be paid under the terms of the decree. In addition, Zouhar had agreed to pay $10,000 to his ex-wife over a period of some years, as well as an additional sum of $5,000. The dischargeability of these debts arising from the property settlement was the basis of the remaining claims in this proceeding.

At any rate, after checking with his attorney about bankruptcy because things were "getting tight," Zouhar purchased a home on March 11, 1978. Under the terms of this transaction, Zouhar became bound to pay in excess of $650.00 a month. This sum was in sharp contrast to the estimated $250–$300 sum per month for shelter he had contemplated in the settlement negotiation, in which he had estimated $3200 in monthly expenses to meet all his obligations. Under the terms of the decree, his ex-wife and children would receive the sum of $1,425 per month.

Plans for the bankruptcy proceeded apace. On April 28, 1978, Zouhar wrote a check for $1,860 to Albuquerque Academy for tuition for his son for the school year to commence in the fall of 1978. This tuition was not due until August, 1978. Under the terms of the decree, Zouhar was obligated to pay this sum; but, with refreshing candor, he testified that he had pre-paid this amount because otherwise it would go to the trustee.

Other payments of Zouhar which were attacked were payments of $400 on an account slightly in excess of $300, and a payment of $243.28, representing two payments on a car owned by a friend but utilized by Zouhar. This payment was also made on April 28, 1978, and represented both the April and May payments. The May payment was not due until May 30, 1978.

However, the chief transaction about which complaint is made revolves around

the stock in the professional corporation which Zouhar owned. On April 27, 1978, Zouhar borrowed $44,792.50, pledging the stock in the professional corporation as collateral. This amount of cash exceeded all of the unsecured debts Zouhar then owed, but instead of paying the debts, he purchased an annuity with the funds. The annuity was structured so that the payments were directed to the holder of the note and security interest encumbering the stock in the professional corporation. There is evidence that this phase of the plan was not disclosed to Zouhar's attorney. Zouhar candidly admitted the purpose of this seemingly round-robin transaction was to claim the annuity exempt under state law, and thus to shield these assets from his creditors. This transaction was completed on May 1, 1978, and the petition in bankruptcy promptly followed on May 3, 1978.

If the transactions are valid, Zouhar will emerge from bankruptcy, having discharged his obligation to divide his community property with his ex-wife under the settlement agreement and his other obligations apart from the divorce, with a net worth of approximately $130,000.

■ It seems to me that such a result would be an abuse of the legitimate bankruptcy process. Under the circumstances of this case, I hold that the transfer to Albuquerque Academy and the transaction by which Zouhar acquired cash by mortgaging his stock in order to purchase an exempt asset were fraudulent within the meaning of § 14(c)(4) and that Zouhar should accordingly be denied a discharge. The basis for the holding is set forth below.

With respect to the pre-payment of tuition at Albuquerque Academy, the facts here are remarkably similar to *Losner v. Union Bank*, 374 F.2d 111 (9th Cir. 1967), in which the bankrupt, also a medical doctor, likewise admitted the cash disbursement to creditors in order to avoid having the funds pass to the bankruptcy estate. The court upheld the denial of discharge on the bankrupt's intent to hinder, delay or defraud his creditors. *Id.* at 112.

There are general equitable grounds that to me weigh heavily against permitting the debtor to be successful in his efforts to use the annuity to shield his assets from his creditors. As so aptly observed by able and astute counsel for the Bank, the debtor here did not want a mere *fresh* start, he wanted a *head* start. While it is the function of bankruptcy to give hard-pressed debtors a fresh start in life, a start with a net worth of $130,000 and an income of $70,000 does seem to be a considerable head start.

While it has generally been held that the transmutation of non-exempt assets into exempt assets on the eve of bankruptcy is not fraudulent per se, 3 Remington on Bankruptcy § 1278 (rev. ed. 1957), 1A Colliers on Bankruptcy ¶ 6.11(5) (14th Ed. 1978), those cases permitting such transfers generally involved considerably smaller sums than are involved here. That considerable body of authority for legitimizing such transactions can be distinguished on the fact that much smaller amounts were there involved.

For example, in *Crawford v. Sternberg*, 220 F. 73, 76 (8th Cir. 1915), the court stated:

It is well settled that it is not a fraudulent act by an individual who knows he is insolvent to convert a part of his property which is not exempt into property which is exempt for the purpose of claiming his exemptions therein, and of thereby placing it out of the reach of his creditors.

The case involved two partners, each of whom withdrew $200 from the partnership for the purpose of holding those sums exempt. Not only is that amount vastly smaller than the amount involved in this case, but it should be noted that the *Crawford* court made reference to the fact that only a part of the property of the debtor was involved, unlike this case in which all of the property of the debtor is involved.

Likewise, in a more recent case, the Ninth Circuit court held that a sum of $1000 taken from the bankruptcy's business and placed in a savings and loan association account would be allowed as exempt property. *Matter of Jackson*, 472 F.2d 589 (9th

Cir. 1973). The court also held that, while the purposeful conversion of non-exempt assets into exempt assets immediately prior to bankruptcy is not fraudulent per se, the validity of the exemption is controlled by application of state law. *Id.* at 590.

But a bankruptcy court in the state of Washington has found an exception to the rule allowing conversion of non-exempt property into exempt when the conversion is made with the intent to defraud creditors, no matter what sum is involved. *Matter of Mehrer*, 2 B.R. 309 (Bkrtcy.E.D.Wash. 1980). There is much good sense in Judge Hanel's opinion in *Mehrer.* The debtor in that case transferred a great deal of his property to an exempt insurance policy on the eve of bankruptcy. While the trustee's objection to the claim of exempt property was upheld upon the basis of a particular Washington state statute, the court noted that the debtor's transfer of property to exempt assets was the very action that created his insolvency even though Mehrer maintained motives other than keeping his assets from creditors. Zouhar was considerably more forthright here than the debtor Mehrer; the circumstances found persuasive there are likewise persuasive here.

In contrast to the more limited exemptions permitted under the laws of other states, the New Mexico statutes permit unlimited exemptions with respect to insurance, N.M.Stat.Ann. § 42–10–3 (1978) and with respect to pension and retirement plans, N.M.Stat.Ann. § 42–10–2 (1978). The vastly enhanced potential for exemptions in New Mexico obviously presents the potential for abuse of legitimate exemptions. The difference, which seems initially to be one merely of degree, at some point as yet unspecified becomes a difference in kind which requires a different result. This same principle was succinctly stated by Judge Logan in *Dolese v. United States of America*, 605 F.2d 1146, 1154 (10th Cir. 1979), "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered." That principle fully applies here. While a bankrupt is entitled to adjust his affairs so that some planning of one's exemptions under bankruptcy is permitted, a wholesale sheltering of assets which otherwise would go to creditors is not permissible.

At least here, where the transmutation of assets was in an amount sufficient to render the debtor insolvent, and where the amount transmuted was more than sufficient to pay all of the debtor's unsecured debts, the transmutation must be stamped as fraudulent. In addition, recognition should be given here to the fact that the chief debts sought to be discharged came from a community property settlement agreement entered into by the debtor made very shortly before the filing of the petition.

Moreover, the purpose which motivated Zouhar in this case is not the purpose for which the New Mexico legislature enacted the exemption statute. Zouhar forthrightly admitted that he had no interest in the annuity for any retirement or insurance purpose, and merely utilized this method as a device to shield his assets from his creditors. This candid admission is also supported by the sequence of events, and by the purchase of a home at the time Zouhar was feeling unable to discharge his existing burdens.

An examination of state exemption law, following the rule of *Jackson, supra*, shows that as long ago as *New Mexico National Bank v. Brooks*, 9 N.M. 113, 49 P. 947 (1897), the Supreme Court characterized the policy of the New Mexico exemptions statute permitting the exemption of wages necessary to the support of the debtor and his family as follows:

The legislature, in conformity with public policy now generally prevalent, enacted the exempting statute to encourage the formation of the family relation by conferring upon the heads of household privileges to protect their families against want in the event of misfortune but it was never intended that these generous provisions should be prostituted to the encouragement of extravagance, and the evasion of just indebtedness by indulgence in luxurious living. The statute

exempts the personal earnings of the debtor entitled to its benefits to the amount necessary for the support of his family, and courts in administering the law should take into due consideration the facts and circumstances of each case. *Id.* at 128–29, 49 P. 947.

In *Hernandez v. S. I. C. Finance Co.*, 79 N.M. 673, 675, 448 P.2d 474, 476 (1968), a similar note was struck when the Supreme Court declared, "We recognized that the exemption statutes are designed to protect debtors from becoming destitute as a consequence of unforeseeable indebtedness." Self-induced insolvency is not protected under the New Mexico exemption statute. It is clear in this case that Zouhar was actually solvent prior to the transfer, and it is the very transaction here attacked which, by changing non-exempt assets into exempt assets, renders Zouhar insolvent under the Bankruptcy Act. The beneficent purposes of the New Mexico statutes would not be carried out in the present case if discharge were allowed, because the purpose here was only to hide the assets from the trustee, not to provide long-term protection against the death or disability, or for the retirement, of Dr. Zouhar.

■ It deserves mention that Zouhar's actions in this case were largely taken at the recommendation of Zouhar's attorney. It is frequently held that a client's following an attorney's advice will negate any element of bad faith, but that rule requires a complete disclosure to the attorney. The evidence here was that no such complete disclosure occurred, so that following the recommendation of an attorney should not serve to insulate this transaction from attack.

Accordingly, the Bank's objection to discharge of defendant Raymond Zouhar is sustained, and the discharge will be denied. That disposition makes it unnecessary to consider the questions of the dischargeability of the individual debts.

Under § 64(a)(3), the Albuquerque National Bank is entitled to its reasonable costs and expenses for successfully opposing the discharge. *England v. American Trust Company*, 267 F.2d 20 (9th Cir. 1959). If counsel cannot agree on an appropriate amount, the amount to be awarded can be noticed for an evidentiary hearing.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the discharge of the bankrupt Raymond Zouhar be, and the same hereby is, denied.