In re Darryl KULWIN, Debtor.

Nathan REESE, Plaintiff,

v.

Darryl KULWIN, Defendant.

Bankruptcy No. 92–21557–7.
Adv. No. 92–6144.

United States Bankruptcy Court,
D. Kansas.

Aug. 8, 1995.

Jack N. Bohm of Buck, Bohm & Stein, P.C., Leawood, KS, for Plaintiff Nathan Reese.

John F. Michaels of Rose, Brouillette & Shapiro, Kansas City, MO, for Debtor/Defendant Darryl Kulwin.

## MEMORANDUM OPINION[1]

JOHN T. FLANNAGAN, Bankruptcy Judge.

This adversary proceeding raises an objection to discharge under 11 U.S.C. § 727(a)(2)(A),[2] which denies discharge if a debtor transfers property within one year of the filing of his bankruptcy petition with the intent to hinder, delay, or defraud a creditor.

The parties ask the Court to determine this matter on cross motions for summary judgment, although only debtor has filed a formal motion for summary judgment. At oral arguments on debtor's motion for summary judgment, counsel for plaintiff stated that he would also file a motion for summary judgment. The parties agreed that upon the filing of plaintiff's motion, no further responses would be filed and the matter could be considered under advisement by the Court.

However, plaintiff did not file a motion for summary judgment. Instead, the parties

---

1. Plaintiff Nathan Reese appears by his attorney, Jack N. Bohm of the firm of Buck, Bohm & Stein, P.C., Leawood, Kansas. Debtor Darryl Kulwin appears by his attorney, John F. Michaels of the firm of Rose, Brouillette & Shapiro, Kansas City, Missouri.

2. This proceeding is core under 28 U.S.C. § 157. The Court has jurisdiction under 28 U.S.C. § 1334 and the general reference order of the District Court effective July 10, 1984 (D.Kan. Rule 705).

submitted a joint pleading entitled "Stipulation Regarding Submission of Case." The stipulation states:

1. That the Plaintiff's objections to Defendant's Motion for Summary Judgment may be considered by the Court as a Motion for Summary Judgment by the Plaintiff.

2. The parties hereby agree that the above-entitled adversary proceeding is submitted for decision by the Court on the basis of the below-listed pleadings:

   a. Plaintiff's Complaint Objecting to Discharge of Debtor.

   b. Answer of Defendant–Debtor Darryl Kulwin.

   c. Agreed Order to Strike Paragraph 4 of Plaintiff's Complaint Objecting to Discharge of Debtor.[3]

   d. Stipulation regarding knowledge of Nathan Reese.

   e. Defendant–Debtor's Motion for Summary Judgment.

   f. Suggestions in Support of Defendant–Debtor's Motion for Summary Judgment, including debtor's schedules attached thereto.

   g. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment.

   h. Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment.

   i. Plaintiff's Trial Brief.

   j. Defendant's Trial Brief.

(Stipulation Regarding Submission of Case filed July 7, 1993, at 1–2.)

Although no motion for summary judgment has been filed by plaintiff, the Court grants the parties' request that "Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment" be considered a motion for summary judgment.

## FINDINGS OF FACT

The parties prepared and submitted a Pre-trial Order, filed May 24, 1993, in which they stipulate to the following facts:

a. Defendant/Debtor filed his Voluntary Petition under Chapter 7 on July 17, 1992 as an "asset case."

b. Defendant/Debtor's Schedules list the following non-exempt assets:
Schedule B—Personal Property

| Type of Property | Current Market Value of Debtor's Interest |
|---|---|
| 1. Cash on Hand | $ 65.00 |
| 2. Checking, savings or other financial accounts, etc. | $ 775.00 |
| 12. Stock–Sayne International Industries, Inc. | Unknown (minimal) |
|     Matrix Membranes, Inc. | Unknown (minimal) |
| 15. Accounts receivable-Asch/Grossbardt | $4,895.41 (approx) |
| 20. Other contingent and unliquidated claims—Claims against Allyson Reese in Case N. SCO 10272 in the Superior Court of California, County of Los Angeles, Western District | Unknown |
| 33. Other personal property of any kind—Retainer with Wilner, Kline, et al. | $500.00 (approx.) |

c. As set out in debtor's Statement of Financial Affairs, the debtor made the following transfers:

   1. On April 2, 1992, to Charles Schwab and Company, the amount of $6,728.00, for an SEP–IRA.

   2. On June 9, 1992, to the Winward Corporation, his employer, in the amount of $2,410.50, to reimburse it for funds advanced on a corporate credit card.

   3. On June 30, 1992, to Capitol Federal Savings & Loan, in the amount of $130,000.00, to reduce the amount owed on the mortgage on his home.

   4. On June 30, 1992, to Capitol Federal Savings & Loan, in the amount of $5,315.42, to pay off a home equity loan on the debtor's residence.

---

**3.** Paragraph 4 of the Complaint states that granting relief to the debtor would constitute a substantial abuse of the Bankruptcy Code and requests that the Court, on its own motion, dismiss the case under 11 U.S.C. § 707(b).

5. On June 29, 1992, to Overland Park Jeep Eagle, in the amount of $15,746.54, for a new vehicle.

6. On July 1, 1992, to Winward Corporation, his employer, in the amount of $1,076.75 to reimburse it for funds advanced on a corporate credit card.

7. On July 8, 1992, to Charles Schwab and Company in the amount of $9,000.00, for an SEP–IRA.

8. On July 13, 1992, to Capitol Federal Savings & Loan, in the amount of $5,100.00, to reduce the mortgage loan on his home.

9. On July 15, 1992, to Capitol Federal Savings & Loan, in the amount of $900.00 to reduce the mortgage loan on his home.

d. The debtor, according to his Statement of Financial Affairs, made the following gifts, transfers or contributions:

1. On November 19, 1991, to daughter Hillary Kulwin, in the amount of $4,543.00, which represented automobile insurance proceeds.

2. On January 2, 1992, to daughter Hillary Kulwin, in the amount of $100.86 for Santa Fe Pacific Corporation stock.

3. On January 24, 1992, to daughter Hillary Kulwin, in the amount of $1,000.00.

4. On February 3, 1993 and March 2, 1992, stock to daughter Hillary Kulwin, with the value of $117.50 of each transfer.

5. On April 1, 1992, stock to daughter Hillary Kulwin, with the value of $127.50.

6. On May 1, 1992 and June 1, 1992, stock to daughter Hillary Kulwin, with the value of $127.50 of each transfer.

e. On July 7, 1992, in consideration of her payment of $21,900.00, debtor transferred to his sister Sherri Nelson, a 3.57% interest in Edgeview Apartment Promissory Note, with the debtor's scheduled value of $21,900.00.

f. On June 30, 1992, debtor transferred to his wife, Sherron Kulwin, a 1991 Ford Escort, valued at $8,225.00, in exchange for a Mitsubishi with a value of $8,175.00.

g. On June 29, 1992, the debtor traded the 1989 Mitsubishi on a 1992 Jeep Cherokee Laredo.

h. Pursuant to the Court's Order on Motion to Approve Compromise, filed January 26, 1993, the Trustee accepted $1,631.80 from the debtor in full satisfaction of Estate's claim to the Asch/Grossbardt's accounts receivable (No. b. 15 above).

---

(Pre–Trial Order filed May 24, 1993, at 2–6.)

The Court takes judicial notice of the following facts contained in the debtor's schedules and statement of financial affairs, which are attached as Exhibit A to the Suggestions in Support of Defendant–Debtor's Motion for Summary Judgment.

1. Debtor has five unsecured creditors: (1) Albert Robin, 1989 loan, $11,000; (2) Bosshard & Co., 1989 commission advance, $17,206.20; (3) Nathan Reese, 1985–88 loans, $191,312 (listed as contingent, unliquidated and disputed); (4) Philip Wexler, 1987 loan, $6,000; and (5) Winward Corporation, 1992 monthly draws against commissions due, $992. (Debtor's Schedule F.)

2. Debtor has no priority unsecured debts and has only one secured debt, to Capitol Federal Savings and Loan for $25,066.74, secured by a mortgage on debtor's homestead. (Debtor's Schedules D and E.) The homestead, valued at $230,000, is debtor's only real property. He states that he owns the property jointly with his wife, who has not filed a bankruptcy petition. The property, located in Johnson County, Kansas, is also listed as debtor's business address. (Debtor's Schedule A and Statement of Financial Affairs, Question 16a.)

3. In the one year preceding the filing of his bankruptcy petition, no creditor attached, garnished or seized any property belonging to debtor (Statement of Financial Affairs, Question 4b), and none of debtor's property had been repossessed, sold at a foreclosure sale, or transferred through a deed in lieu of foreclosure, or returned to the seller (Statement of Financial Affairs, Question 5). The only lawsuit involving the debtor in the one year before the filing was a breach of contract suit filed by Reese in the Superior Court of California, County of Los Angeles. (Statement of Financial Affairs, Question 4a.)

4. Debtor paid the law firm of Rose, Brouillette & Shapiro, P.C., $547.40 in February of 1992 and $633.65 in March of 1992

for debt counseling, and an additional $5,379.25 in the 90 days prior to the filing of his bankruptcy for debt counseling and bankruptcy representation. (Statement of Financial Affairs, Question 9; Statement of Affairs, Question 3a.[4])

5. In addition to the payments listed in paragraph "c" of the parties' stipulated facts, in the four months preceding the filing of his bankruptcy petition, debtor made the following payments, totaling $11,499.30:

| 4/1/92 | Winward Corporation | | $ 2,040.00 |
| 5/5/92 | Winward Corporation | | $ 2,040.00 |
| | | Total | $ 4,080.00 |
| 4/13/92 | CitiBank Visa | | $ 1,319.00 |
| 5/15/92 | CitiBank Visa | | $ 939.00 |
| 6/24/92 | CitiBank Visa | | $ 319.00 |
| | | Total | $ 2,577.00 |
| 6/25/92 | Jade Alarm | | $ 900.00 |
| 7/1/92 | Jade Alarm | | $ 1,091.00 |
| | | Total | $ 1,991.00 |
| 6/9/92 | James Vickers, Painter | | $ 673.21 |
| 6/28/92 | James Vickers, Painter | | $ 900.00 |
| | | Total | $ 1,573.21 |
| 6/15/92 | ClosetTec | | $ 575.00 |
| 6/30/92 | ClosetTec | | $ 703.09 |
| | | Total | $ 1,278.09 |

(Statement of Financial Affairs, Question 3a.)

6. The total value of debtor's exempt property is $281,209. (Debtor's Schedule C.)

7. Debtor's non-exempt property consists of a checking account containing $775 and a contingent account receivable from Asch/Grossbardt valued at $4,895.41.[5] (Debtor's Schedule B.) The trustee accepted $1,631.80 from debtor in full satisfaction of the estate's claim to this account receivable. (Order on Motion to Approve Compromise filed January 26, 1993.)

**4.** Statement of Affairs, Question 9, states that the debtor paid Rose, Brouillette & Shapiro, P.C., a total of $5,615.85. However, this amount does not include a payment of $944.80 made by the debtor on April 21, 1992, and listed in Statement of Affairs, Question 3a.

**5.** Included in Schedule B—Personal Property are three other items of nonexempt personal property: debtor's interest in two corporations and his interest in a contingent, unliquidated claim against Alyson Reese. The value for each of these is listed as unknown and the Trustee's Interim Report No. 6, filed April 27, 1995, indicates all three will be abandoned to the debtor at the close of the case.

8. Debtor, a self-employed representative of Winward Corp. and Asch/Grossbardt, earns gross income of $10,000 per month. (Statement of Financial Affairs, Question 16a and Debtor's Schedule I.) This amount is reduced by $2,400 per month for income and self-employment taxes, leaving a net income of $7,600 per month. He states that at the time he filed his Chapter 7 petition, he had paid $31,730 in estimated taxes for 1992. (Debtor's Schedule I.)

9. Debtor is married, although his spouse, Sherron Kulwin, did not join in his bankruptcy petition. Debtor has one dependent, an 18-year old daughter. (Debtor's Schedule I.)

10. Debtor's current monthly expenditures total $7,433 and include the following monthly expenses:

| | | |
|---|---|---|
| a. | mortgage payment | $1,417.00 |
| b. | property insurance | $ 416.00 |
| c. | homeowner's or renter's insurance | $ 132.00 [6] |
| d. | telephone | $ 430.00 |
| e. | home maintenance | $ 250.00 |
| f. | medical and dental | $ 315.00 |
| g. | homeowner's insurance | $ 132.00 |
| h. | life insurance | $ 188.00 |
| i. | health insurance | $ 320.00 |
| j. | auto insurance | $ 135.00 |
| k. | disability and hospitalization insur. | $ 195.00 |
| m. | regular expenses from operation of business | $2,000.00 [7] |

(Debtor's Schedule J—Current Expenditures of Individual Debtor.)

## DISCUSSION

Federal Rule of Civil Procedure 56, governing summary judgment, is made applicable to bankruptcy proceedings though Fed. R.Bankr.P. 7056. The summary judgment rule provides that the Court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions

**6.** There is no explanation for the separate expenses for homeowner's or renter's insurance and for property insurance. However, the two expenses total $548 per month or $6,576 annually. This amount is extraordinary high and considerably in excess of the ordinary cost of property insurance necessary to insure debtor's real estate, valued at $230,000 and his household goods, furnishing and equipment valued at $15,000.

**7.** Debtor did not provide any itemization of these business expenses as required by Schedule J.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment. *Eaton v. Jarvis Products Corp.*, 965 F.2d 922, 925 (10th Cir.1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," summary judgment is proper. *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Plaintiff, debtor's former father-in-law and an unsecured creditor in debtor's bankruptcy, sued Kulwin in 1991 in California state court for breach of contract. The case was pending at the time debtor filed his bankruptcy and plaintiff's debt is listed in the bankruptcy schedules as contingent, unliquidated, and disputed. Plaintiff's complaint seeks denial of the debtor's discharge under § 727(a)(2)(A) which provides:

(a) The Court shall grant debtor a discharge, unless—

.   .   .   .   .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition. . . .

Although the period of inquiry under § 727(a)(2)(A) is one year, the transfers at issue in this case all occurred in the four months preceding the filing of Kulwin's bankruptcy. The parties stipulate that during this time period Kulwin converted over $170,-000 in non-exempt assets to exempt assets and also made several transfers of non-exempt property to third parties. Both parties

request summary judgment and agree that the facts relating to the transfers are undisputed.[8] The question presented is whether debtor made the transfers, particularly the transfers of non-exempt assets to exempt assets, with the intent to hinder, delay, or defraud a creditor.

Debtor contends he is entitled to summary judgment because Reese has failed to provide any extrinsic evidence that the transfers were made with an intent to hinder, delay, or defraud any of his creditors. Without extrinsic evidence of intent, debtor claims the transfers of non-exempt assets to exempt assets constitute legitimate prebankruptcy planning and cannot be used as grounds for denial of his discharge.

It is well-settled that conversion of non-exempt assets to exempt assets prior to filing bankruptcy does not necessarily constitute fraudulent conduct on the part of the debtor. *Douglas County Bank v. Fine (In re Fine )*, 89 B.R. 167, 174 (Bankr.D.Kan.1988). However, under § 727(a)(2)(A), a debtor will be denied a discharge if he transfers property to a third party or converts non-exempt to exempt property with the actual intent to hinder, delay, or defraud a creditor. *Id.* at 174. *See also Marine Midland Business Loans, Inc. v. Carey (In re Carey )*, 938 F.2d 1073, 1076 (10th Cir.1991).

Plaintiff has the burden to prove by a preponderance of the evidence that the debtor transferred property with the requisite intent. *First National Bank of Gordon v. Serafini (In re Serafini )*, 938 F.2d 1156 (10th Cir.1991). The Court must find actual intent to hinder, delay, or defraud a creditor, proven either by direct evidence or by inference from the facts and circumstances of the debtor's conduct. *Fox v. Schmit (In re Schmit )*, 71 B.R. 587, 590 (Bankr.D.Minn. 1987).

Although the parties focus almost entirely on the issue of inference of intent, Reese does provide direct evidence that Kulwin transferred property with the actual intent to hinder, delay, or defraud a creditor.

---

**8.** Plaintiff does raise a question of fact regarding the adequacy of the consideration received for the Edgeview Apartment Promissory Note.

However, the Court finds this fact is not material to the decision in this matter.

Plaintiff submits a portion of a transcript from a deposition of Alyson Reese.[9] Ms. Reese, plaintiff's daughter and debtor's ex-wife, testified about a conversation she had with the debtor just prior to his filing bankruptcy. The following is an excerpt from her deposition:

Q. It sounds like your father is upset about the fact that Darryl's filed bankruptcy?

A. Well, especially since it—it came up that this was very deliberate on Darryl's part, that he was filing bankruptcy to get out of having to pay these debts [owed to Nathan Reese] back.

Q. And how do you know that?

A. Well, before Darryl filed bankruptcy, he told me he was going to do this.

Q. And when did he tell you this?

A. It was the latter part of the July before the August that he filed bankruptcy ... he took me aside and explained to me that he had enlisted a top-notch attorney who was going to help him file bankruptcy in lieu of paying my father back any money that he owed him, that he would file bankruptcy before my father would see one dime of what he owed him.

Q. Did he use that exact language or is that a paraphrase of the conversation?

A. It's paraphrased.

Q. Can you remember the exact language that he used in that conversation? ...

A. Not exactly.

Q. What exactly can you remember?

A. I can remember Darryl telling me that my father was an asshole.

Q. Did he use that exact term?

A. To the best of my knowledge.

Q. Okay. Go on.

A. That my father was an asshole for not accepting an offer that Darryl had made him previously as settlement for the debts owed, and that he had hired himself, I believe he said, an ace of an attorney to get out of the situation before he would let my father see one dime....

Q. And how did you respond to Darryl?

A. I believe I said, "This is something I don't want to get in the middle of." He asked me not to tell my father. I think I—to the best of my—to the best of my knowledge, I tried to remain neutral.

Q. I take it, though, you told your father about that conversation?

A. Correct.

(Exhibit 9 to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment filed June 9, 1993, at 32–35.)

Debtor's response to this deposition testimony is minimal at best. He offers no affidavit or deposition testimony in rebuttal and has not specifically addressed the testimony in any written pleading. In order to oppose a motion for summary judgment, a "party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

Kulwin has failed to respond with any specific facts relating to the deposition testimony and has not filed any objection or motion to strike the deposition testimony submitted by plaintiff. Failure to object or move to strike an affidavit, deposition or exhibit offered to support a motion for summary judgment is considered a waiver of any formal defect. *Noblett v. General Electric Credit Corp.,* 400 F.2d 442, 445 (10th Cir.1968), *cert. denied,* 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed.2d 271 (1968).

■ Despite the lack of any specific response or objection, the record contains two statements that may be interpreted as a challenge to Ms. Reese's testimony.

The first is found in debtor's reply brief, where he states:

Kulwin acknowledges that the contested transfers occurred and further acknowl-

---

9. Ms. Reese's first name is spelled in various ways throughout the pleadings, i.e., Allison, Allyson, Alyson. Although the correct spelling is not clear, the Court uses the form found in Plaintiff's Witness List, Exhibit List and Summary of Testimony and Evidence filed June 18, 1993, at 1.

edges the timing of such transfers. Plaintiff has nothing to add to this matter; his only *allowable evidence* is the information contained within Plaintiff's [sic] verified statement and schedules.

(Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment file June 21, 1993 at 5.) (Emphasis added.)

Although debtor did not raise any objection to Ms. Reese's testimony, the Court speculates that the reference to "allowable evidence" may suggest Kulwin believes Ms. Reese's testimony would not be admissible on the grounds that it constitutes inadmissible hearsay. Hearsay is defined in Fed. R.Evid. 801(c), while statements which do not constitute hearsay under the Rules of Evidence are listed in Fed.R.Evid. 801(d). Subsection (d) provides:

> (d) **Statements which are not hearsay.**
> A statement is not hearsay if—
>
> .   .   .   .   .
>
> (2) **Admission by party-opponent.**
> The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity. . . .

Any objection to Ms. Reese's testimony as hearsay would fail since Fed.R.Evid. 801(d)(2) provides that an admission by a party-opponent does not constitute hearsay.

Furthermore, since Ms. Reese is listed as a witness and presumably would be available for cross examination at trial, the deposition statement could come in as a "Prior Statement of a Witness" under Fed.R.Evid. 801(d)(*1*), or if she was not so available, it could be admitted as "Former Testimony" under Fed.R.Evid. 804(b)(1) since counsel for Kulwin elicited the testimony quoted above.

■ The second possible challenge is a statement made during oral arguments, where counsel argued that statements made by the debtor to a third party are irrelevant.

Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ms. Reese's testimony would certainly be relevant since it provides direct evidence of debtor's intent in transferring property prior to commencing his bankruptcy, which is the only issue remaining to be determined in this matter.

Not only is Ms. Reese's testimony relevant, at least one court has held that when such direct evidence of the debtor's intent is found, it is unnecessary to consider any inference raised by the debtor's conduct in making the prepetition transfers. *First Beverly Bank v. Adeeb* (*In re Adeeb*), 787 F.2d 1339, 1343 (9th Cir.1986).

Ms. Reese's testimony provides strong evidence of debtor's actual intent to hinder, delay, or defraud a creditor. However, this matter is before the Court on motions for summary judgment and in light of the nature of the parties' arguments, which deal almost exclusively with the inference of intent issue, the Court will consider the circumstances and facts surrounding the transfers and the inference raised by debtor's conduct.

■ Since direct evidence of fraudulent intent is rarely available, creditors frequently can offer only circumstantial evidence to establish a debtor's intent to hinder, delay, or defraud a creditor under § 727(a)(2)(A). *Marine Midland Business Loans, Inc. v. Carey* (*In re Carey*), 938 F.2d 1073, 1077 (10th Cir.1991). Courts have identified various types of conduct on the part of a debtor, referred to as "badges of fraud," that may suggest an intent to hinder, delay, or defraud a creditor. In *Carey,* the 10th Circuit listed several indicia of fraud, including: (1) a debtor's concealment of prebankruptcy conversions; (2) conversion of assets immediately before the filing of the bankruptcy petition; (3) gratuitous transfers of property; (4) continued use by the debtor of transferred property; (5) transfers to family members; (6) obtaining credit to purchase exempt property; (7) conversion of property after the entry of a large judgment against the debtor; (8) a pattern of sharp dealing by the debtor prior to bankruptcy; and (9) insolvency of the debtor resulting from the conversion of assets. *Id.* at 1077.

*Carey* noted that the monetary value of the assets converted prior to the commencement of the bankruptcy is also a consideration in determining whether the debtor acted with fraudulent intent. "The cases, however, are peculiarly fact specific, and the activity in each situation must be viewed individually." *Id.* at 1077.

The specific facts of this case show that debtor converted a large amount of non-exempt property to exempt property and paid certain unsecured creditors in the four months preceding the filing of his bankruptcy petition. While the conversion of assets immediately before filing bankruptcy constitutes a recognized badge of fraud, an inference of intent comes from viewing the conversions in light of the facts and circumstances of the case.

The Court begins by looking at the value of the property converted or transferred by Kulwin just prior to filing his bankruptcy. The statement of affairs shows that between April 1992 and July 17, 1992, the date he filed his Chapter 7 petition, Kulwin converted approximately $174,600 from non-exempt to exempt property. These conversions included payments to Capitol Federal to pay down his home mortgage by over $140,000 just two weeks before filing his bankruptcy; purchase of a new Jeep Cherokee Laredo valued at $19,500 two-and-one-half weeks before filing bankruptcy; and transfer of approximately $17,600 to IRA accounts, $9,000 of which was transferred just ten days before filing bankruptcy.

According to debtor's statement of affairs, he also paid select unsecured creditors over $14,900 in the four months before he filed his Chapter 7 petition. These transfers and payments in the four months before the filing of the bankruptcy petition amount to approximately $189,500. This is an extraordinary amount that takes on added significance when compared against the debtor's estimate of his unsecured claims, which the record reveals is approximately $70,000 to $75,000.

Debtor's schedules show that he has only five general unsecured debts, no unsecured

priority debts, and only one secured debt. Kulwin's lone secured creditor, Capitol Federal Savings and Loan, has a claim of $25,066.74, secured by a lien against the homestead. Debtor lists the value of his home as $230,000.

Although the schedules indicate debtor has a total of $226,510.20 in unsecured, nonpriority debt, that amount includes plaintiff's claim of $191,312, which debtor lists as contingent, unliquidated and disputed. Of the remaining unsecured debts, one is for less than $1,000 and is owed to Mr. Kulwin's employer; two others are to individuals, listed as unsecured loans made in 1987 and 1989. None of these three entities filed proofs of claim. Debtor's other unsecured creditor, Bosshard & Co., has a claim for commissions advanced in 1989 in the amount of $17,206.20.

The amount listed as Reese's unsecured claim reflects the amount claimed in the California state court breach of contract action filed by Reese against Kulwin. The complaint [10] states that on July 7, 1988, Reese and Kulwin entered into a written contract which provided that Kulwin would pay Reese $191,312.00. According to the complaint, the agreement further provided that if Kulwin adhered to the payment schedule contained in the agreement, Reese would accept the sum of $91,654 in full satisfaction of the contract. Reese alleges that debtor defaulted and failed to meet the specified payment schedule and therefore the entire contract amount became due and owing.

Debtor states that the amount due Reese arises from loans made to the debtor and Reese's daughter, Alyson, for her medical bills and related expenses incurred in the years 1985 though 1988. In a deposition taken by plaintiff's counsel, debtor acknowledges entering into the agreement with Reese in 1988. He states that he has paid Reese $34,000 and that he believes he still owes Reese about $35,000 to $40,000. (Exhibit 4 to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment filed June 9, 1993, at 45.)

**10.** Attached as Exhibit 3 to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment.

Using debtor's own estimate of what he owes Reese, Kulwin's unsecured claims amount to approximately $70,000 to $75,000, and four of the five unsecured claims listed in the bankruptcy schedules represent personal loans from individuals or from Kulwin's employer or former employer. This is in stark contrast to the fact that Kulwin transferred or converted from non-exempt to exempt property over $189,500 in the four months before he filed bankruptcy.

Although debtor argues that the transfers represent legitimate prebankruptcy planning, that assertion presupposes a legitimate need to file for bankruptcy protection. This issue does not ordinarily arise in decisions involving a § 727(a)(2) objection because the majority of the cases involve a debtor who transferred assets in the face of significant and overwhelming debt. For example, in *Carey* the debtor owed one creditor alone $2,000,000 and the transfers complained of were $180,000 in payments on her home mortgage over a 21–month period prior to bankruptcy. 938 F.2d at 1075; *In re Carey*, 96 B.R. 336, 339 (Bankr.W.D.Ok.1989). In *Fine*, 89 B.R. at 175, the debtor listed $1,384,482.51 in debts and the transfers in question totaled approximately $40,000. And, in *In re Davis*, 124 B.R. 831 (Bankr. D.Kan.1991), one of the creditors held a claim for $409,586.04 and the transfer in question amounted to approximately $35,000.

The fact that Kulwin transferred or converted more than twice the amount he felt he owed to his unsecured creditors can not be said to reflect legitimate prebankruptcy planning. Furthermore, as a result of these transfers, debtor brought to bankruptcy only two assets available to satisfy unsecured creditors: the first, a checking account with a balance of $775.00; the second, a contingent accounts receivable claim against Asch/Grossbardt for $4,895.41, released to Kulwin by the trustee for a payment of $1,631.80. The trustee recovered a total of $2,406.80. However, administrative expenses in the case amounted to $2,073.59, leaving approximately $328.00 available to distribute to unsecured creditors. (Order on Application to Pay Administrative Expenses and Interim Distribution to Creditors filed March 28, 1995.)

The Court also notes that these transfers occurred after Kulwin began consulting with the law firm of Rose, Brouillette & Shapiro, P.C., for debt counseling in February of 1992. Besides this objection to discharge, filed some three months after the commencement of the case, and the California suit handled by separate counsel, the schedules and statement of affairs reveal no financial problems. Yet, from February to July of 1992, debtor paid $6,560.65 to this firm for debt counseling and for the filing of his Chapter 7 bankruptcy.

In *Albuquerque National Bank v. Zouhar* (*In re Zouhar*), 10 B.R. 154 (Bankr.D.N.M. 1981), the court stated: "At least here, where the transmutation of assets was in an amount sufficient to render the debtor insolvent, and where the amount transmuted was more than sufficient to pay all of the debtor's unsecured debts, the transmutation must be stamped as fraudulent." *Id.* at 157. The court in *Zouhar* also noted:

[T]he debtor here did not want a mere *fresh* start, he wanted a *head* start. While it is the function of bankruptcy to give hard-pressed debtors a fresh start in life, a start with a net worth of $130,000 and an income of $70,000 does seem to be a considerable head start.

*Id.* at 156.

In *First Texas Savings v. Reed* (*Matter of Reed*), 700 F.2d 986 (5th Cir.1983), the court denied the debtor a discharge under § 727(a)(2)(A), stating:

It would constitute a perversion of the purposes of the Bankruptcy Code to permit a debtor earning $180,000 a year to convert every one of his major nonexempt assets into sheltered property on the eve of bankruptcy with actual intent to defraud his creditors and then emerge washed clean of future obligation by carefully concocted immersion in bankruptcy waters.

*Id.* at 992.

In this case, it appears that debtor seeks more than just a fresh start, or even a head start, but instead, asks for a *running* start. In the four months preceding the filing of his

bankruptcy, Kulwin converted essentially all his non-exempt assets into exempt assets. When he sought protection under the Bankruptcy Code, the schedules indicate debtor had exempt property valued at $281,209 and $10,000 in monthly income. Although debtor claims his income is consumed by his monthly obligations, which total $7,433, the amount of expenses listed is questionable. The record reflects a material deficiency in the statement of expenditures in that debtor failed to provide the required itemization for the $2,000 in business expenses he lists as a monthly expense. Also, as previously noted in footnote 6, the insurance expenses Kulwin lists represent amounts far in excess of what would ordinarily be reasonable for these types of expenses. Even assuming all the expenses are appropriate, they represent a generous budget for an individual, particularly in light of the fact that debtor's only fixed obligation is his $1,400 mortgage payment. Viewed in light of the other facts and circumstances of this case, the amount and nature of the expenses listed only served to support a finding that debtor's bankruptcy petition seeks substantially more than the fresh start intended by the drafters of the Code.

At the time he filed bankruptcy, Kulwin did not face overwhelming debts or a lack of income or assets sufficient to pay his creditors. Instead, it appears that Kulwin targeted Reese's claim primarily, if not exclusively, for discharge and that his decision to file for protection under the Bankruptcy Code resulted from an unwillingness, rather than an inability to pay his debts.

Based on the record taken as a whole, the Court finds that the debtor transferred property within one year of the filing of his bankruptcy petition with the actual intent to hinder, delay or defraud a creditor. The debtor is denied a discharge under § 727(a)(2)(A).

This Memorandum Opinion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.